is Derrick Alfonso Morley. And Ben Cooney is here for Morley. David Turkin is here for the United States. And Mr. Cooney, you may begin your argument. Good morning, Your Honors. I represent Derrick Morley, who was convicted of drug offenses in the Southern District of Florida and received a 60-month prison term. The appeal presents four issues. The warrantless search of his car, lawfully parked, based on the apparent authority doctrine, whether the evidence of his participation in the conspiracy and substantive count was sufficient, and the use of the deliberate ignorance instruction in a case where there was no factual underpinning for that instruction. The fourth issue, the failure to assess a safety valve consideration, we rest on the briefs in light of the Pulsever v. United States Supreme Court decision of last week. This case involved Mr. Morley, who was identified as a dupe. And the question presented, decided adversely by the jury, is that he was knowingly involved in a conspiracy. The evidence is slim, is limited to knowledge between Morley and Edgecombe, plainly the principle in this scheme. Individuals who knew each other actually had stood up at Mr. Morley's wedding for him a few months earlier and had a legitimate automotive-related business. Mr. Morley was a mechanic. Communications, phone calls between the two when Mr. Edgecombe came from into the United States, no suspicion of any wrongdoing whatsoever on Mr. Morley's part. Mr. Morley, at the instructions of Edgecombe, drives his car to a shopping parking lot. Why? Because Edgecombe had left his briefcase overnight in the car. Mr. Morley was stopping to drop off the briefcase, leaves his car, could not lock it because the locks were broken, goes to the Wendy's, and while the drug deal negotiated by Edgecombe takes place, Edgecombe tells the informant, go to that car. The briefcase is on the front seat. The informant does. Mr. Morley at that time is using his mechanic skills helping some stranded motorist in the parking lot. The confidential informant retrieves the briefcase, goes back to Edgecombe, they exchange funds, arrests take place, Mr. Morley is arrested while he's under the hood of the car that he was helping as a Good Samaritan. The access to the car was challenged. What was the basis for the informant, based on instructions from somebody who had no association with that car, did not arrive in the car, was not a passenger in the car? Did not the informant have a reasonable basis to believe that when, I'll call him the friend, but the co-defendant here, when he directed, hey, the drugs are in that car, that that was a credible statement from which law enforcement and an informant could rely on. And we know that because there was an earlier drug deal between these two where he paid, he gave and supplied a half kilo of drugs. There was negotiations leading up to this, you only talked about the day of, but there were negotiations leading up to this for a three kilo purchase of drugs. He said another guy was going to bring it. The guy came shortly after that statement. And they saw the law enforcement before that saw your clients surveil the area. They saw him sort of looking suspiciously back and forth while he was at the Wendy's. And then the friend told them to go there. That seems close to, if not probable cause, to say that there were drugs in the car, right? So, Your Honor, there are a confluence of facts that are not possessed by the informant, by the government actor. But that's not the, you're right, certainly. Although the informant knows a lot of what I just described, not everything. But we look at collective action in these contexts, especially when we're talking about a law enforcement or someone acting on behalf of law enforcement doing something, right? We do. But the informant had no knowledge of the car, the arrival of the car, Mr. Morley whatsoever. And in fact, the evidence presented by the government, known by the informant. But the informant knew not to give the briefcase with the cash until he had the drugs, which was the reason why then Mr. Morley's friend called him to tell him to come over with the car and to leave the car parked there. I mean, if you have a briefcase of someone that is a friend of yours and your car doesn't lock, you don't normally just walk away from a car, do you? I think, Your Honor, it flips both ways. The government says you wouldn't leave cocaine with somebody who doesn't know it's cocaine under circumstances that could result in somebody taking it. Well, obviously, and also you wouldn't leave three kilos with someone you don't trust. Or would you leave three kilos in a car that's not locked going into the Wendy's to get breakfast, get a meal? But there was also testimony that he kept looking back to, because the Wendy's was locked, that he kept looking back to see nervously what was going on with the car. Well, there was testimony that we've written about that in the briefs. Your Honors are familiar with it. But the key there is he goes and helps, as a good Samaritan, somebody else totally oblivious to the car and the supposed knowledge of cocaine in a briefcase. And as Your Honor pointed out, the informant was either put under circumstances where Edgecombe was trying to rip him off by suggesting and asking for the money to be delivered first. So there are two exceptions to the warrant requirement. Yes, sir. The government's going to argue when they get up here. And one is the automobile exception and the other is the consent exception. Correct. You know, first of all, why wouldn't the automobile exception apply? Because the car could be moved at any time. And there was a history between the informant and Edgecombe. So with regard to the automobile exception, let me just briefly say the consent is the apparent authority issue, which I've argued in his brief. The Edgecombe had no apparent authority to authorize consent. With regard to the automobile exception, lawfully parked car, no key in the car, parked in a lawful parking space, nobody in attendance at the car, no ability to drive the car away and no ability to stop the police from taking the status quo while they sought a warrant. Do I hear you arguing mobility? Is that what you're arguing to us? Automobile exception was not used as the basis for the the denial of the motion to suppress. I don't agree with that. That's not my reading of the district court's order. But but even if it was, as I understood it, the parties conceded or at least didn't contest below the mobility part of it. What you argued both in your brief and below was the probable cause part of it, right? Yes, your honor. And the court did say automobile exception did say consent. And the circumstances for automobile exception don't apply here because the car could very readily have been detained. And at least obtain a warrant. Again, you seem to be arguing mobility for the first time, but indulging that that's not the test for mobility, is it? The test for mobility is can the car move? Not could the police stop it or the keys away from it at that time? It's not mobility at the moment. It's the ability of the car to move or not. In other words, we distinguish between a wreck with all four tires gone. That's not really an automobile that has the ability to move versus that which someone drove there, walked away from that car clearly has the ability to move, right? No doubt, Judge. The car was an operating, your honor, the car was an operating car. There was no circumstances at the present time when the informant went to the car that suggested any mobility. And that's the time that the search or the informants access to the car as a government agent took place. It just doesn't seem to be what the test is. In other words, it's not mobility at the moment of search. It's the ability of the car to move in general. As I understand it, do you have any law that supports that the mobility is looked at at the moment the search or is it what I described as the operational capacity of the car itself? Your honor, it is the court automobile exception still utilize the totality of circumstances test and that's on the probable cause side, probable cause side under the mobility under the circumstances here. Is this car able to be moved? And while able not under these circumstances of lawfully parked, the automobile exception should not have applied. Let me move to the Let me ask you about the deliberate ignorance instruction with the time that you have left. There was a deliberate ignorance instruction, but there was also an actual knowledge instruction, right? Yes, sir. If that's the case, then we're bound by our decision in the United States versus Steve that any error would be harmless if there's an actual knowledge instruction given in addition to the deliberate ignorance instruction. Yes, your honor. The the wrinkle here is that the deliberate ignorance instruction when combined with a very slim case of actually no evidence of knowledge suggested and I'll point it out in the brief, the government rationale in trying to argue for successfully the deliberate ignorance, the government states to the judge, he never made any attempt to ask edge comb what was in the bag despite multiple calls, plainly the negligence aspect that has caused this court and other courts so much concern with the deliberate ignorance instruction where the evidence doesn't suggest any deliberate ignorance. The government allegation was actual knowledge and the evidence of actual knowledge is slight as we pointed out in point to this case doesn't fall under the there's sufficient evidence of guilt of actual knowledge. There is not and the deliberate ignorance instruction elevated this case to essentially Mr. Morley convicted because he didn't do what the government suggests he should have done which is ask questions and that's not a basis for a conviction. Based on the briefs and the argument, we asked the court to vacate the convictions and either remand for a new trial, suppress the evidence or discharge Mr. Morley. Thank you, your honors. Thank you, counsel. Mr. Turkin, you may argue for the government. Thank you, your honors. May it please the court, David Turkin and with me at counsel's table is trial attorney Hayden O'Byrne on behalf of the United States. Just to address some of Mr. Cuny's comments going first to the issue of probable cause and the automobile exception, to be clear, it was raised at the district court level that the automobile exception was a basis to search the vehicle. The district court below did find that the car was both readily mobile and that there was probable cause and to follow up on what your honors stated regarding what the automobile exception requires, the automobile exception requires only that the vehicle is readily mobile and operational and that was established by virtue of the fact that Morley, the defendant in this case, drove the vehicle onto the scene and parked the car. It was not disputed, not raised at the district court level nor was it raised in the appellant's brief and so it's the government's position it's not an issue here. Regarding the question of probable cause, it's the government's position that in this case, the confidential source in this case had more than reason to believe that the friend, Edgecombe, in light of the fact that they had previously had a drug deal on August 6, 2021, a successful drug deal, a controlled transaction where half a kilogram of drugs were sold, the source had reason to believe based on that that Edgecombe was a legitimate drug dealer who had both access and control over large quantities of drugs and someone who was willing to follow through on a drug deal that was being coordinated. And they had negotiations after that initial sale and purchase to acquire additional kilos. That's correct, Your Honor. After that initial drug deal on August 6, there were additional communications or additional drug deals were discussed. I think the kilo was $21,000 or $23,000 what they negotiated. I think it was $24,000 a kilogram. And in addition, what I think is also significant to a probable cause determination in this particular case is the fact that in the subsequent discussions between the confidential source and Edgecombe, there was not only mention of a subsequent drug deal but that there was another individual involved. So at this point, not only does the source know that Edgecombe is a legitimate drug dealer, but that there's another individual who's part of this whole conspiracy and also has access and control of the drugs that they're discussing ultimately dealing with on the day of the actual. And wasn't there, I think, also a discussion where Edgecombe wanted to have it in an open location. And so there was a ruse saying that he couldn't move his car, and that's why the initial decision was made to do the drop-off in that location. That's correct, Your Honor. Originally, there was a location that had been suggested. I believe it was actually texted by Edgecombe to the confidential source somewhere that I think was in close proximity to the Home Depot where the deal ultimately took place. But in order for law enforcement to have tactical control over the situation, they had the source reach out and create a ruse, as Your Honor stated, and switch the location up to the Home Depot. And at that point, the CI knew that there was another person who was coming to bring the kilos. That's correct. And in fact, at the scene on September 8, 2021, when the drug deal took place, when the source asked Mr. Edgecombe where the drugs were, he said it was coming, he said someone's bringing it, and you can even hear on the video of this particular transaction, and that's Government Exhibit 22, the source during this whole interaction is on the phone with somebody he's calling Angel but is actually an FBI agent, listening in that they're waiting for his friend to come. So at this point, the source knows, number one, that Edgecombe is a legitimate dealer, that there's another person involved, and that that person is coming to deliver the go get it, it's in the passenger seat, specifically the fact that Edgecombe knows, without even going into the car himself, that it's in that car and in a particular location within that car, based on the totality of the circumstances. The source has more than reason to believe, number one, probable cause to believe that there are drugs in the car on the passenger seat, which turned out to be true. And also, those very facts also support the government's argument of apparent authority, since based on this, it was entirely reasonable for the source to think that this was all part of the deal. We don't have to reach the apparent authority issue, though, if we find probable cause plus the mobility factor. That's correct. This court doesn't even have to reach the issue of apparent authority. It's the government's position that the probable cause here is significant and that there's no reason to address the other arguments regarding the search. I'll next turn to Mr. Cuney's argument regarding deliberate ignorance instruction. It's the government's position here that there was more than sufficient evidence here to support the instruction, and alternatively, there was more than sufficient evidence, even if the court finds that the deliberate ignorance instruction was inappropriate, that there was sufficient evidence of actual knowledge based on the totality of the evidence in this case, which is significant. I believe even the district court said that it was a circumstantial case, but a strong I don't know if this court has any additional questions regarding the court's giving of that instruction. Mr. Cuney also raised, very briefly during his time, a question regarding the sufficiency of the evidence. I'm happy to address that. It's the government's position that, viewing the light most favorable to the government, as well as the evidence and all reasonable inferences, that the evidence establishes more than sufficient evidence to support the convictions of the defendant in this case. Can you go through that? I mean, it's not, you're right that many of these cases are determined through circumstantial evidence, but a lot of times, someone's caught red-handed with the drugs. In this case, this is not a red-handed sort of case, and there's at least an argument that's made that, I had a briefcase, someone told me to bring the briefcase to him, and I had no idea what was inside of it. So, what was there to establish that he knew what was inside the briefcase? Yes, Your Honor, and I would really break it down into three major categories. The first would be both the volume and the timing of the communications between the friend, Edgecombe and Morley. The volume isn't significant. I mean, I know you make that claim, and it may match up nicely with some of our other case law, but as I read it, it's only what the day of, like 14 calls, I think 28 or 30 in the course of really a month. That's not a lot, is it? I would agree with that, Your Honor. I would say, and I guess speaking of the actual day of the drug deal itself, September 28, 2021, a dozen calls, I think the majority, I agree it was something like 15, I believe a dozen of them or so were answered. The majority of them, I think, were somewhere between 6 o'clock going all the way through to the point in time when Morley arrived at the Home Depot parking lot. So, given that Morley's defense in this case was that he was merely dropping off a backpack, which, by the way, there was really no evidence presented at trial at all other than mere argument by counsel as to that, 12 calls is a lot over a two-hour period. The government would argue a significant number of calls just for something as simple as dropping off a bag as opposed to what the government ultimately proved in this case, which is that there was a drug deal. But I think more so than the volume, Your Honor, is the timing of the particular calls. Specifically, that the calls between or text messages between Morley and Edgecombe coincided with basically every significant event in this investigation. Starting all the way back on August 3rd of 2021 when Edgecombe sent a text message to Morley saying, I want you to ride with me to do something, make yourself available. Then there was a drug deal on August 6th. And while Morley never went to that particular drug deal, there was an unidentified female who accompanied him instead. On that very date, Edgecombe sent Morley a text message with the address of the Bass Pro Shop where the drug deal takes place. And common sense, which is part of this analysis, dictates that an individual who's dealing with drugs is not going to send the location of a drug deal to someone not involved. Fast forward to the next day that a drug deal was supposed to take place in this case, which was September 22nd of 2021. Ultimately, a deal didn't take place. But there were a series of calls. And the timing of these calls are particularly important. They started around 10 in the morning. The first call was a call from Edgecombe to the source where he told him that basically the deal wasn't going to happen. That I think he said something to the effect of things are not in place and mentioned about reaching out to a specific person that I believe ultimately the source testified a trial was the person with the drugs. After that call, within minutes, Edgecombe then called the defendant. There were two phone calls. After those two phone calls, a minute after the second phone call, Edgecombe then called the source again to suggest meeting up with the person, also stated that it was somebody that he was going to have to meet with himself. And lo and behold, within an hour of that conversation is when law enforcement observed the defendant, Morley, and Edgecombe together. So based on that evidence alone, a reasonable inference can be made that the individual that was being discussed, the other individual who had access to the drugs was in fact Morley. So those are just the communications before the drug deal took place. Then there's the actual date of the deal on September 28, 2021. When Edgecombe meets with the source, Edgecombe tells him that someone's coming with the drugs. There was testimony from one of the officers that when Morley's car came on the scene, that it was circling around, trolling around, which is consistent with counter surveillance, another factor this court takes into consideration in determining sufficiency of the evidence. So that is just one factor alone, which are the nature or extent and timing of the communications. The second big thing, probably the primary piece of evidence the government would rely on, is the fact that the defendant, in the middle of the night, drove to a remote location, a Home Depot parking lot in his own car with $84,000 worth of cocaine in the front passenger seat. It wasn't really the middle of the night. It wasn't about 8 or 9 o'clock. That's true, but I suppose it's not in the middle of nowhere. It's a Home Depot shopping center in the middle of Broward County. That's a good point, Your Honor. I think that's true. We're not talking about the middle of the Everglades at midnight. It's not Tallahassee. It is not Tallahassee. Certainly not, Your Honor. That being said, I think it was a remote part of the Home Depot parking lot. In addition to that, it was actually on two minutes' notice of having been texted the address of the Home Depot by Edgecombe. So he was basically ready to go is the inference from those facts. And I think merely the fact that he drove there with the drugs in his car, in and of itself putting aside the communications and the conduct of the defendant at the scene, driving the drugs in his car alone under this court's case, United States v. Cuoco Carpio, is sufficient evidence to prove his knowing and willful entry into the conspiracy. So more so even than the Cuoco Carpio case, we have the communications. We have him driving the drugs to the scene under the prudent smuggler doctrine. He's not going to be entrusted with $84,000 worth of drugs unless he's involved. So that would apply. And then, of course, there's Mr. Morley's conduct once he parked at the Home Depot, which is he got out of the car, he quickly walked away, walked across the street, didn't acknowledge his friend who he was there to see, walked to the Wendy's across the street where there was plenty of testimony from the officers that there were plenty of parking spots at that location. He could have parked there. The Wendy's was closed, but the drive-thru was open. He never went to the drive-thru. He just paced around there for three to five minutes or so. All conduct that is not consistent with someone who's merely present at the scene but putting it all together, someone who actually is involved. So that would be the evidence that the government would be relying on with respect to sufficiency unless this court has any additional questions on that. I see I have two and a half minutes left. I don't know if, Your Honors, I don't want to— Well, I think we have your argument, Mr. Turkin. Thank you very much, Your Honors. Thank you. And Mr. Cooney, you've reserved some time for rebuttal. Your Honors, with regard to the evidentiary insufficiency, we cite the two cases of U.S. v. Stanley and U.S. v. Lewis. Significant, although the facts are all individualized, where the presence of the suspect package without any connection to the defendant was not sufficient to establish knowledge that the packages contained cocaine. Nothing suspicious evidenced in the trial about how that briefcase came to be in the car. Evidence that Mr. Morley and Edgecombe were friends in legitimate purposes, had been together in the short time that Edgecombe was in the United States in Fort Lauderdale, had visited automotive locations, exactly what Mr. Morley did, and the day of the incident, 8.30 at night, Mr. Morley dressed in his mechanic clothes. There were 14 minutes of phone calls. Only about eight seconds involved actual communications. Mr. Morley drove to the location to drop off the briefcase and meet his friend for a meal. And if he was... Were they eating at the Bass Pro Shop a month earlier? Your Honor, no evidence to that effect, although... There is evidence from the WhatsApp chats that are encrypted that have to be unencrypted where he was sent the location of the first drop. Why get sent the location of the first drop and the location of the second drop? Can't the jury infer at that point that he goes to the drops or he is involved in the drops? Without any evidence and there was evidence from the surveillance? Nobody saw, nobody knew? Agreed. There's no indication that he was actually there. But a drug dealer who's involved in significant amounts of drugs is sending him the location of two different drug drops in the course of a month and there's text messages indicating that there is a guy who is the supplier or the holder of the drugs. How can a jury not infer from that that your client, who is the one who showed up with the drugs, is the guy? And that's exactly why using a deliberate ignorance instruction here allowed the jury to elevate what is a confluence of innocent events. Remember, Mr. Edgecombe said in response to questioning by the police, this guy's a dupe, had no idea what was going on and in the first instance the deliverer was also duped, not a knowing part of the conspiracy. Indicative of the fact that here Mr. Edgecombe was calculating crafty and brought in Mr. Morley without any knowledge or intent to get involved in the drug deal. For those reasons, we ask for a reversal and vacation. Thank you, judges. Thank you, counsel. And Mr. Cooney, I see that you were appointed by the court to represent Mr. Morley and the court thanks you for your service.